SEALED

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FEB 2 5 2015

CLERK, U.S. DISTRICT COURT
By _____

# United States District Court

**NORTHERN** _____ **DISTRICT OF** _____ **TEXAS**

| In the Matter of the Search of | APPLICATION AND AFFIDAVIT |
|---|---|
| (Name, address or Brief description of person, property or premises to be searched) | FOR SEARCH WARRANT |

209 Stoneridge Drive, Mesquite, Texas

**CASE NUMBER:** 3:15-MJ- *107-BH*

I __Michael Reuler__ being duly sworn depose and say:

I am a(n) __Task Force Officer with the Federal Bureau of Investigation (FBI)__ and have reason to believe that on the person of or __XX__ on the property or premises known as (name, description and/or location)

(SEE ATTACHMENT A).

in the __NORTHERN__ District of __TEXAS__ there is now concealed a certain person or property, namely (describe the person or property to be seized)

(SEE ATTACHMENT B).

**which is** (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
property that constitutes evidence of the commission of a crime, contraband, the fruits of crime, and is, otherwise, criminally possessed, **concerning a violation of Title __21__ United States code, Section(s) __846__. The facts to support a finding of Probable Cause are as follows:

(SEE ATTACHED AFFIDAVIT OF FBI TASK FORCE OFFICER MICHAEL REULER).

**Continued on the attached sheet and made a part hereof.** __XX__ Yes __ No

Signature of Affiant
MICHAEL REULER
Task Force Officer, FBI

Sworn to before me, and subscribed in my presence

__February 25, 2015__ at __Dallas, Texas__
Date | City and State

**IRMA C. RAMIREZ**
**United States Magistrate Judge**
Name and Title of Judicial Officer | Signature of Judicial Officer

# ATTACHMENT A

**Location A: 209 Stoneridge Drive, Mesquite, Texas**

Location A a single-family two-story residence of multicolored reddish brick construction with white trim. The numbers 209 are displayed on the front of the house in black numbering over the front entry garage door. There are three second story windows and two windows on the first story visible from the front of the house. The roof is covered with asphalt shingles and the front door of the residence appears to be of light colored wood construction. There are surveillance cameras visible from the front of Location A attached to the exterior of the residence. On the day the photograph provided below was taken there was a black Chevrolet Tahoe Texas license plate BV7N658, a silver Hummer H2 parked in the driveway of Location A. There was a Mercury Sports Utility Vehicle parked on the street in front of Location A.

 

## ATTACHMENT B
## Description of Items to be Seized

The items to be seized during these search warrants include the following:

1.  All records evidencing violations of 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute a Controlled Substance).

2.  All records relating to the possession of, transportation, sale, manufacture, and concealment of narcotic drug sales and disposition of proceeds from narcotic drug sales.

3.  All mail and other records indicating residency at the search location(s), and all documents that bear the names of individuals as referenced in the affidavit or that are located on/in the search location(s) premises at the time of the execution of the warrant.

4.  All currency, financial instruments, precious metals, jewelry, and/or other items of value derived from profits and proceeds of narcotic sales, and evidence of financial transactions related to obtaining, transferring, laundering, secreting, or spending large sums of money made from engaging in narcotic drug sales.

5.  All cellular telephones used in the commission of the drug trafficking, and cellular telephones, telephone bills, calling cards, telephone and address books, papers, or electronic devices which reflect names, addresses and/or telephone numbers of individuals associated in dealing in illegal controlled substances.

6.  All photographs of individuals, property, and illegal controlled substances.

7.  All drug paraphernalia, including equipment or material of any kind used or designed to be used in manufacturing, compounding, converting, concealing, producing, processing, preparing, injecting, inhaling, or otherwise introducing into the human body a controlled substance.

8.  All equipment, materials, chemicals, and all substances used in packaging, cutting, weighing, processing, cooking, heating, and distributing controlled substances.

9.  All vehicles used to facilitate the trafficking of controlled substances.

10. All controlled substances.

11. All firearms and ammunition.

12. All records or items which could be used to facilitate robberies, burglaries, or other violent acts, including masks, tasers, tire deflation devices, GPS tracking devices and items associated with those devices, radio scanners, radio communication devices, and restraint devices.

13. All camera security system equipment and recordings.

14. All records related to surveillance of targets for potential robberies, burglaries, kidnappings, or carjackings.

15. All records related to surveillance of law enforcement officials.

16. All records related to bank accounts or other monetary instruments where the proceeds of illegal activities might be stored or maintained.

17. All records related to the identity of co-conspirators.

18. All computer hardware used to commit, further, or facilitate any violation of the offenses cited above, including any and all electronic storage devices or electronic equipment capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data. Included within the definition of computer hardware is any data processing hardware (such as central processing units and self-contained laptop or notebook computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical and compact disk storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communications devices (such as modems, cables and connections, recording equipment, RAM and ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, cell phones, and electronic tone generating devices); and any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks).

**Attachment B – Page 2**

19.   For any computer hardware seized pursuant to this warrant, all records evidencing, memorializing, or identifying the individual(s) who owned, used, possessed, accessed, or controlled the hardware device at the time the events described in the affidavit above, including but not limited to any logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail contacts, communications and correspondence (including but not limited to e-mail, chat, and instant messaging), and photographs.

20.   For any computer hardware seized pursuant to this warrant, all records evidencing, memorializing, or identifying any electronic storage device or equipment that was attached or connected by any means or manner to the hardware device.

21.   All computer software used to commit, further, or facilitate any violation of the offenses cited above, including any and all information, instructions, programs, or program codes, stored in the form of electronic, magnetic, optical, or other media, which is capable of being interpreted by a computer or its related components.   Computer software may also include data, data fragments, or control characters integral to the operation of computer software, such as operating systems software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended to be used to communicate with computer components.

22.   All computer software designed, intended, or that can be used to delete, eliminate, encrypt, hide, or obscure any records on any computer hardware device or equipment.

23.   All computer-related documentation, meaning any written, recorded, printed, or electronically-stored material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

24.   All passwords and data security devices, meaning any devices, programs, or data -- whether themselves in the nature of hardware or software -- that can be used or are designed to be used to restrict access to, or to facilitate concealment of, any computer hardware, computer software, computer-related documentation, or electronic data records.   Such items include, but are not limited to, data security hardware (such as encryption devices, chips, and circuit boards); passwords; data security software or information (such as test keys and encryption codes); and similar information that is required to access

computer programs or data or to otherwise render programs or data into usable form.

The term record, as used above, means any document, information, data, or material, including that used to facilitate interstate communications, in whatever form and by whatever means such document, information, data, or material, its drafts or modifications, may have been created or stored, including, but not limited to, any hand-made form (such as writing or marking with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negative, video tapes, motion pictures or photocopies); any mechanical form (such as photographic records, printing or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact disks); or any data or information on an electronic or magnetic storage device (such as floppy diskettes, hard disks, CD-ROMs, optical disks, printer buffers, sort cards, memory calculators, electronic dialers, or electronic notebooks), as well as printouts or readouts from any magnetic storage device, including any electronic information or data, stored in any form, which has been used or prepared for use either for periodic or random backup (whether deliberate, inadvertent, or automatically or manually initiated), of any computer or computer system. The form such information might take includes, but is not limited to, floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, CD-ROM disks, video cassettes, and other media capable of storing magnetic or optical coding.

**Attachment B – Page 4**

## Affidavit in Support of Search Warrant

I, Michael S. Reuler, having been duly sworn, do depose and state as follows:

## PREFACE

1.     The following affidavit is furnished to support an application for a search warrant at 209 Stoneridge Drive, Mesquite, Texas, (Location A).

2.     This location is located in the Dallas Division of the Northern District of Texas. Location A is a single-family residence as further described in Attachment A.

3.     Location A is used as the primary residence for Ferrer Oracio, who has been identified is source of supply of methamphetamine that was supplying a Drug Trafficking Organization (known hereinafter as the "Maya DTO") and which uses Location A to further illegal activities including the possession of illegal narcotics with an intent to distribute.

4.     Agents believe that Location A is currently being used to conceal quantities of methamphetamine, cash, and proceeds gained from the sale of narcotics, and records related to the sales of methamphetamine.

5.     I believe that probable cause exists that in this location, evidence, fruits, and/or instrumentalities of violations of federal law, specifically 21 U.S.C § 846 (conspiracy to possess with intent to distribute a controlled substance) (the "Target Offense") will be found.

## Background on Affiant

6.     I have been employed by the City of Dallas as a Police Officer for approximately fifteen years. I have been a Gang Detective since 2006 and have been a TFO with the FBI since 2012. I have participated in previous investigations of violent crime

**Affidavit in Support of Search Warrant – Page 1**

related to criminal street gangs, investigations of unlawful narcotics distribution, and have conducted or participated in physical and electronic surveillances, the execution of search warrants, debriefing of informants, and the review of taped conversations. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, distributed, and the methods of payments for such drugs. I am also familiar with the methods by which narcotics traffickers communicate and the code words commonly used by narcotics traffickers.

7.      I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), that is, I am an officer of the United States who is authorized by law to conduct investigations of, and make arrests, for offenses enumerated in 18 U.S.C. § 2516.

### Background on Investigations Involving Illegal Narcotics

8.      Based on my training and experience, and participation is this investigation and other investigations involving drug trafficking organizations, I know:

a.      Individuals who deal in illegal controlled substances routinely conceal in their residences, vehicles, out buildings, places of operation and places of business, caches of illegal controlled substances, large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of illegal controlled substance transactions relating to obtaining, transferring, secreting or spending large sums of money made from engaging in illegal controlled substances activities.

b.     It is common for individuals who deal in illegal controlled substances to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, out buildings, places of operation, and places of business and/or motor vehicles for ready access and to conceal such items from law enforcement authorities.

c.     Individuals who deal in illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the transportation, ordering, sale, and distribution of illegal controlled substances.  These individuals commonly "front" (provide illegal controlled substances on consignment) illegal controlled substances to their clients and thus maintain some type of records concerning monies owed.  The aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the dealer in illegal controlled substances has ready access to them including but not limited to on his/her person, in his/her motor vehicles, in his/her place of business or place of residence.  These individuals commonly utilize ledger books and computer systems to maintain these records.  A long-standing pattern of criminal activity can support a finding of probable cause to search for these items even if fairly long periods of time have lapsed between the criminal acts and the issuance of the warrant.

d.     Individuals who deal in illegal controlled substances profit from the sale of illegal controlled substances and they attempt to legitimize these profits.  To accomplish these goals, these individuals utilize false and fictitious business records, foreign and

domestic banks, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate shell corporations and business fronts.

   e. Individuals who deal in illegal controlled substances commonly maintain addresses or telephone numbers in books or papers, which reflect names, addresses and/or telephone numbers for their associates in their illegal organization.  In addition, these individuals utilize telephone systems to maintain contact with their associates in their illegal business.  These telephones are often in the primary location of these individual's illegal businesses, be it residence, place of business, or motor vehicles.

   f. Individuals who deal in illegal controlled substances take, or cause to be taken, photographs of themselves, their associates, their property and their illegal product. These individuals usually maintain these photographs in their possession or at their residences or places of operation.

   g. Individuals who deal in illegal controlled substances usually keep paraphernalia for packaging, cutting, weighing, manufacturing and distributing of illegal controlled substances.  This paraphernalia includes laboratory equipment and glassware, chemical formulas, manufacturing notes, scales, plastic bags and cutting agents.

   h. Individuals who deal in illegal controlled substances or individuals that reap substantial profits from providing the raw materials and equipment utilized in illegal conduct, commonly violate federal income tax laws by attempting to conceal the true amount and source of their income from the government.

i.     Individuals who deal in the illegal distribution of controlled substances commonly utilize cellular telephones in order to maintain contact with their clients and suppliers. These individuals utilize the cellular telephones and caller identification devices in an attempt to prevent Law Enforcement agents from discovering their true location at the time the illegal drug transactions are occurring. Often these individuals utilize these devices to maintain or store the telephone numbers and other information about their co-conspirators where they will have easy access to them.

j.     Firearms are tools of the drug dealer's trade. I have been involved in several search warrants involving illegal narcotics distributors and can state that on almost every occasion the suspects were found to be in possession of firearms. I know that these firearms are used by drug traffickers to protect their illegal enterprises.

k.     Drug traffickers typically utilize counter-surveillance equipment to warn them of possible intruders, including law enforcement. I have personally observed such equipment present at drug traffickers' residences on numerous occasions.

9.     Through my training and experience, I know that illegal drug trafficking is frequently a continuing activity over months and even years. Illegal drug traffickers typically will obtain and distribute controlled substances on a regular basis much as a distributor of a legitimate commodity would purchase stock for sale, and similarly such drug traffickers will have an "inventory" which will fluctuate in size depending upon the demand for the product. I expect the drug trafficker to keep records of his illegal activities for a period exceeding beyond the time during which he/she actually possess illegal controlled substances, in order

**Affidavit in Support of Search Warrant – Page 5**

that he can maintain contact with his criminal associates for future drug transactions, and so that he can have records of prior transactions for which, for example he might still be owed money, or might owe someone else money. Drug traffickers frequently use third parties to transport shipments of illegal drugs and cash proceeds from the sale of illegal drugs. These third parties use a variety of methods to transport shipments of illegal drugs and cash, including automobiles.

## Probable Cause

10.     I state, that based upon my training experience, and the facts set forth herein, there is probable cause to believe that the evidence sought to be located, as fully described in Attachment B, will be located at Location A, as described herein, including all storage places, safes, garages, structures and any automobiles which may be found within the curtilage of each of the suspected premises. Attachment B is attached hereto and incorporated by reference.

11.     On February 10, 2015, at the direction of law enforcement, a Cooperating Defendant (CD-1) placed a consensually recorded telephone call to an individual that CD-1 knows only as "Primo" who used telephone number (214) 281-7864.

12.     During this telephone call, CD-1 negotiated the purchase of one kilogram of methamphetamine for $12,500.00. CD-1 agreed with "Primo" to do this transaction at the Grand Prairie Premium Outlets in the area of Great Southwest Parkway and Interstate Highway 20 in Grand Prairie, Texas.

13.     CD-1 provided law enforcement with information about "Primo" and his drug dealing operations that led to the arrest of CD-2 (who served as a "runner" for Primo) and who was found to be in possession of one kilogram of methamphetamine subsequent to a traffic stop conducted on the same day as the telephone call.

14.     During this operation and after CD-2's arrest through a traffic stop, law enforcement was able to identify Alfonso Bladamir Flores, who at the time law enforcement believed to be involved in this transaction based on surveillance and information received from CD-1.

15.     On February 11, 2015, Affiant secured a signed Criminal Complaint for CD-2 in the Northern District of Texas for violation of Title 21 United States Code, Section(s) 841(a)(1).  The Criminal Complaint was signed by United States Magistrate Judge Paul D. Stickney, Northern District of Texas.  CD-2 was taken out of State custody and placed into Federal custody pursuant to this warrant.

16.     On February 11, 2015, law enforcement spoke with CD-2 about the arrest as part of a standard proffer agreement.  CD-2 admitted to transporting the methamphetamine for an individual CD-2 knows as "Luis."

17.     Law enforcement showed six individual photos to CD-2 and CD-2 identified Alfonso Bladamir Flores as the individual CD-2 knows as "Luis," and the individual he/she was transporting methamphetamine for.

18.     CD-2 stated that Flores drives a black Lexus with one regular headlight and one blue-tinted headlight. This was the same vehicle that law enforcement stopped on February 10, 2015, and identified Flores as the driver.

19.     Based on the information provided by CD-1 and surveillance conducted on February 10, 2015, which led to the traffic stop of Flores who was driving a black Lexus with one regular headlight and one blue tinted headlight, law enforcement believed that Flores is the same individual known by CD-1 as "Primo."

20.     CD-2 stated that he/she has been delivering kilogram quantities of methamphetamine for Flores since October 2014.

21.     CD-2 stated that on the night he/she was arrest, Flores called and instructed CD-2 to meet him at "the spot" where CD-2 has been numerous times to pick up large quantities of methamphetamine to deliver for Flores.

22.     On February 19, 2015, CD-2 identified Location A as the location where he/she has been numerous times to pick up large quantities of methamphetamine to deliver for Flores.

23.     CD-2 identified Ferrer Oracio as living at Location A and has observed Oracio handing bags containing methamphetamine to Flores at the front door of Location A prior to Flores placing the bags in CD-2's vehicle to be delivered.

24.     While identifying Location A to law enforcement, CD-2 observed Oracio arriving at Location A in a black Chevrolet Tahoe bearing the Texas license plate BV7N658.

25.     CD-2 stated that he/she has delivered approximately fifteen kilograms of methamphetamine for Flores some of which were multiple deliveries in one day.  CD-2 stated that he/she always meets Flores at Location A where CD-2 is provided with the quantities of methamphetamine by Flores to be delivered.  CD-2 identified Location A as the place he/she picked up the kilogram of methamphetamine from Flores the night CD-2 was arrested.

26.     I believe that CD-2 is credible and reliable.

27.     On February 19, 2015, Affiant secured a Criminal Complaint for Alfonso Bladamir Flores a.k.a. Primo, a.k.a. Luis, for violation of Title 21 United States Code, Section(s) 846.  The Criminal Complaint was signed by United States Magistrate Judge Paul D. Stickney, Northern District of Texas.  Flores has not been arrested at this time.

28.     Based upon all of the foregoing examples, as well as other aspects of the investigation, I believe that it is clear that Location A is being used to further the illegal activities of Oracio and Flores, and that illegal narcotics are being stored or maintained at Location A.

29.     Further, I believe that the items listed in Attachment B will be located at the subject property, more fully described in Attachment A.

**(The remainder of this page is intentionally left blank)**

## CONCLUSION

30.     This investigation has shown that Alfonso Bladamir Flores and Ferrer Oracio

are distributing methamphetamine, and they are using Location A as a repository for illegal

narcotics and other evidence of drug-related crimes.


Michael S. Reuler
Task Force Officer, FBI
Dallas, Texas

Subscribed and sworn to before me this _25th_ day of February, 2015


HON. IRMA C. RAMIREZ
United States Magistrate Judge
Northern District of Texas

**Affidavit in Support of Search Warrant – Page 10**